**Leslie Jerry WILLIAMS, Appellant,**

v.

**MUNICIPALITY OF ANCHORAGE, Appellee.**

**No. 4721.**

Supreme Court of Alaska.

Sept. 11, 1981.

---

Francis S. Floyd, Bradbury, Bliss & Riordan, Inc., Anchorage, for appellant.

Robert B. Mason, Pletcher & Slaybaugh, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, and BURKE, JJ.

OPINION

BURKE, Justice.

This appeal involves a challenge to the superior court's application of Alaska Civil Rule 56, in an action for damages for personal injuries. Appellant Leslie Williams contends that there were genuine issues of material fact barring entry of summary judgment in favor of appellee, the Municipality of Anchorage. We reverse.

Williams, plaintiff in the court below, was employed as first mate aboard the ocean tug *M/V Kirt Chouest.* On October 12, 1975, the *M/V Kirt Chouest* docked at the Port of Anchorage, a facility owned and operated by the Municipality of Anchorage. During the late evening hours of October 12, the tug's one-piece, twenty-five foot ladder was either lost or stolen. The ladder was necessary for access to the top of the dock alongside which the vessel was moored.

After discovering the disappearance of the ladder, Williams or another crew member requested and received the use of another ladder from a port employee, one Glenn Vestal. Vestal later stated, "[I] thought it would be better and safer to lend them a ladder than have them try to jump onto the tug and risk killing themselves."[1]

The ladder was used without incident until the following day, October 13. That evening, however, the ladder collapsed as Williams was climbing from the vessel to the top of the dock. Williams fell to the deck below and was seriously injured.

Williams sued the Municipality of Anchorage and others, on theories including strict liability and negligence. Asserting that it owed the plaintiff no duty of care and that no genuine issue of material fact was presented, the municipality moved for summary judgment pursuant to Alaska Civil Rule 56. The motion was granted, without opinion, on November 14, 1978.

A party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that [the] party is entitled to judgment as a matter of law." Alaska R.Civ.P. 56(c). In determining whether summary judgment is proper in a particular case, the trial court's function is limited to determining whether or not a genuine issue of material fact exists. *Wilson v. Pollet*, 416 P.2d 381, 384 (Alaska 1966). Where the record presents such an issue of fact, the question must be resolved at trial. "In ruling on a motion for summary judgment all reasonable inferences from the proofs offered are drawn against movant and viewed in the light most favorable to the party opposing the motion." *Id.* at 383–84. *See also Alaska Rent-A-Car, Inc. v. Ford Motor Co.*, 526 P.2d 1136, 1139 (Alaska 1974); *Ransom v. Haner*, 362 P.2d 282, 290 n.24 (Alaska 1961).

Thus, the party seeking summary judgment "has the entire burden of proving that his opponent's case has no merit." *Nizinski v. Golden Valley Electric Ass'n, Inc.*, 509 P.2d 280, 283 (Alaska 1973), *quoting Braund, Inc. v. White*, 486 P.2d 50, 54 n.5 (Alaska 1971).

Williams first argues that the municipality is strictly liable for his injuries, since it voluntarily undertook to perform a duty owed him by the vessel's owners.[2] The owners, North American Towing Company and Totem Marine Tug & Barge, Inc., had a strict duty to provide Williams and the other crewmembers with a seaworthy means of ingress and egress. *Sanford v. Caswell*, 200 F.2d 830 (5th Cir.), *cert. denied*, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1366 (1953); *Sullivan v. Lyon Steamship Ltd.*, 63 Wash.2d 316, 387 P.2d 76 (1963), *cert. denied*, 377 U.S. 932, 84 S.Ct. 1335, 12 L.Ed.2d 296 (1964). According to Williams,

> Since the municipality voluntarily undertook to perform the duty owed by the vessel owner[s] to Williams, the municipality assumed an absolute duty to provide a seaworthy means of ingress and egress to Williams and other members of the crew. The municipality, by assuming the duty, must be held to the same standard of care as the one[s] from whom the duty is assumed, *i. e.*[,] the vessel's owner[s].

Appellant's Brief at 12 (citation omitted).

In *Shannon v. City of Anchorage*, 478 P.2d 815 (Alaska 1970), we held that the then City of Anchorage, now the Municipality of Anchorage, could not be held strictly liable on this theory, stating: "[T]he doctrine of unseaworthiness has no applicability." 478 P.2d at 819 n.20. Williams attempts to distinguish *Shannon* on the ground that the city there *failed* to provide a ladder, allegedly contrary to its past custom and practice, while in the case at bar the municipality *furnished* a ladder for the

---

1. The director of the Port of Anchorage stated by affidavit that it was against the port's policy to provide a "means of ingress and egress from vessels docking at the port except on rare occasions on an emergency basis."

2. We reject the municipality's argument that the issue of whether it assumed a duty was not properly raised in the trial court and preserved for appeal.

crew's use, thereby assuming the duty of the vessel's owners. This distinction, however, fails to persuade us that a different rule should apply in the instant case. "The idea of seaworthiness and the doctrine of implied warranty of seaworthiness arises out of the vessel, and the critical consideration in applying the doctrine is that the person sought to be held legally liable must be in the relationship of an owner or operator of a vessel." *Daniels v. Florida Power & Light Co.*, 317 F.2d 41, 43 (5th Cir.), *cert. denied* 375 U.S. 832, 84 S.Ct. 78, 11 L.Ed.2d 63 (1963).[3]

Williams next argues that, even if not strictly liable under the maritime doctrine of unseaworthiness, the municipality is liable for his injuries if it failed to exercise reasonable care.

▮ The municipality is correct in its contention that it had no statutory duty to provide a ladder for the use of the *M/V Kirt Chouest. Shannon v. City of Anchorage*, 429 P.2d 17, 18 (Alaska 1967). However, having undertaken to provide a ladder, it was under a duty to exercise *some* degree of care for the safety of those using the same. "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully . . . ." *Adams v. State*, 555 P.2d 235, 240 (Alaska 1976), *quoting Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275, 276 (1922). The precise nature and extent of that duty, while a question of law, depends upon the nature and extent of the act undertaken, a question of fact. *See* Restatement (Second) of Torts §§ 321–324 A, (1965).

▮ In the case at bar there was evidence indicating that the loan of the ladder involved more than the mere supplying of a chattel. In a recorded interview with James Keenan, an insurance investigator, Vestal stated that after loaning the ladder

to the tug's crew he "went so far as to check it once they put it on the to [sic] the dock, to make sure it was stable at the time." He further stated,

At the time, the skipper of the tug or first mate, the one who was injured the next day, had the ladder upside down to begin with, stuck it down there upside down and was attempting to use it that way. *I corrected the situation and gave them some pointers.* I said that they should watch the ladder and make sure they keep it away from the dock when its not in use and have somebody check it and make sure there's plenty of space for it to reach the dock. I quoted them the port regulations on it and everything and they didn't seem to really care too much. They didn't do anything about it for a couple of days.

(Emphasis added.) Thus, there was evidence that Vestal not only loaned the ladder to the crew, but that he also undertook to install it "properly" and instructed the crew on how it should be used for the purpose for which it was loaned.

This evidence, we believe, was sufficient to give rise to a genuine issue of fact concerning whether the municipality, through its employee, undertook to render a "service" within the meaning of section 323 of the Restatement (Second) of Torts. That section provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

There were also issues of fact concerning the adequacy of the municipality's perform-

---

**3.** In *Daniels*, which we also relied upon and quoted in our opinion in *Shannon v. City of Anchorage*, 478 P.2d 815, 819–20 n.20 (1970), the court refused to apply the doctrine of unseaworthiness to seamen's claims against a dock owner arising out of a fall from a ladder owned by the defendant where, "[t]he sole connection of the dock owner . . . with the ship on which the seamen were employed was in the [dock owner's] tacit allowance of the use of the ladder by the seamen." 317 F.2d at 44.

ance according to the applicable standard of care. The exact cause of the accident is not clear. It may have been due to the fact that the ladder was unsafe for its intended use. The manufacturer indicated that the ladder had no "shoes" to provide traction between the base of the ladder and the surface upon which it was resting, and that the type of ladder in question was unsuitable for the use that was made of it.[4] Alternatively, the accident may have been caused, at least in part, by the method in which the ladder was installed or used, perhaps due to the way Vestal "corrected the situation" and/or the instructions that he gave to the crew concerning the use of the ladder.

For these reasons we hold that the superior court erred in granting the municipality's motion for summary judgment. Having reached this conclusion, we deem it unnecessary to address the other issues raised in this appeal.

REVERSED and REMANDED.

MATTHEWS and COMPTON, JJ., not participating.

4. We take judicial notice of the fact that the accident occurred while the vessel was moored in the waters of Cook Inlet, an area famous for its strong currents and extreme differences in the level of the water between high and low tide. *See Shannon*, 478 P.2d at 820. These factors could be expected to cause considerable movement of the vessel, particularly in relation to the top of the dock as the tide ebbed and flowed.